# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1015

_____

Thomas Moran,                                    *
                                                 *
        Appellant,                     *
                                                 *
   v.                                            *
                                                 *
Anne-Marie Clarke; Robert Haar;                  *
Wayman F. Smith, III; Jeffery Jamison;           *  Appeal from the United States
Clarence Harmon, comprising the                  *  District Court for the Eastern
Board of Police Commissioners                    *  District of Missouri.
of the City of St. Louis; Ronald                 *
Henderson; Paul M. Nocchiero;                    *
Gregory Hawkins: Al Klein; Willie                *
Thirdkill; Jack Huelsmann; William               *
Kusmec; William Swiderski; Richard               *
Booker, Jr.; Terrence DuPree; Barry              *
Greene; Steven Petty; Harvey Laux,               *
                                                 *
        Appellees.                     *

_____

Submitted: January 10, 2001

Filed: April 16, 2001 (Corrected 5/1/01)

_____

Before BEAM, MORRIS SHEPPARD ARNOLD, Circuit Judges, and DOTY, District
    Judge.[1]

_____

_____

[1]The Honorable David S. Doty, United States District Judge for the District of
Minnesota, sitting by designation.

BEAM, Circuit Judge.

Thomas Moran, a St. Louis police officer, sued the St. Louis Board of Police Commissioners ("the Board" or "Board") along with various police officials and officers, alleging malicious prosecution and violations of his substantive due process rights. He now appeals the district court's adverse grant of judgment as a matter of law, along with various evidentiary and discovery rulings and the district court's denial of his motion for recusal. We find the district court erred in awarding judgment as a matter of law. We reverse and remand for a new trial, and for reconsideration of the evidentiary, discovery and recusal rulings.

I.

This action represents the end product of a tragic series of events. On April 14, 1997, St. Louis police officers Richard Booker and Steven Petty responded to a report of a burglar alarm at a private residence.[2] Inside the apartment, the officers encountered Gregory Bell, a mentally-impaired teenager. Bell's impairment prevented him from providing the proper alarm code or explaining to the officers that he lived there. Thinking him a burglar, the officers attempted to place Bell under arrest, whereupon Bell resisted. During the ensuing fight, the officers repeatedly struck him with metal batons and sprayed him with mace. During the struggle, one of the officers placed an "officer in need of aid" call.

At that time, Sergeant Moran was on duty at a police substation. With him were EMS attendants Mark Rauss and Larry Campbell. When the "officer in need of aid" call came in, Moran immediately headed to the scene. Anticipating their own call,

---

[2]Given the district court's disposition of this case, we state the facts in a light most favorable to Moran, assume the truth of his evidence, and draw all reasonable inferences in his favor. Otting v. J.C. Penney Co., 223 F.3d 704, 708 (8th Cir. 2000).

Rauss and Campbell also responded. When Moran reached the scene, ten to thirteen police cars already blocked the street. Moran had to park far down the street and walk back to the residence. Meanwhile, some combination of responding officers eventually subdued Bell. After he ceased resisting, Bell was brought from the house in handcuffs. Dispatcher and 911 tape recordings show that Moran did not arrive at the house until after Bell had been subdued. Moran alleges that after he arrived on the scene, he entered the house and encountered Bell in the kitchen as he was being removed from the house. Rauss and Campbell treated Bell from the moment he was brought outside until the time he was transported from the scene. According to Rauss, Moran did not use mace on Bell during that period. The incident left Bell with severe lacerations to the head and a broken ankle. It is undisputed that throughout this course of events, Moran neither struck nor used mace upon Gregory Bell.

Within seventy-two hours of the incident, Police Chief Ronald Henderson apologized publicly and committed himself to finding and punishing the responsible officers. On April 19th, the Saturday following the beating, Major Hawkins, the Inspector of Police, received an anonymous phone call informing him that Officer Barry Greene had been at the scene and wanted to make a statement. Ordinarily, internal investigations are handled by the Internal Affairs Division ("IAD") and Chiefs of Police are rarely involved. In this case, however, Major Hawkins, Chief Henderson and Captain Nocchiero, the IAD commander, met with Officer Greene that Saturday evening in Henderson's office, while the assigned IAD investigators, Sergeants Thirdkill and Klein, were never notified. Officer Greene gave a taped statement accusing Sergeant Moran of beating Bell. None of the participants asked Greene a single question. Greene later testified that in fact he gave two statements, the first of which did not implicate Moran, and which was not recorded.

In the wake of the beating, IAD began interviewing all those involved, and ultimately interviewed approximately fifteen officers. Among those interviewed were Officers Petty and Booker, both of whom waived their Miranda rights and gave statements. At trial, Moran established that officers in such a situation, facing potential

criminal charges of their own, usually do not waive their rights. Booker testified that he would not have waived his <u>Miranda</u> rights had he not known at that point that he was not a target of any criminal investigation.

After the first round of interviews, no other officer had corroborated Officer Greene's allegation. IAD then began calling officers back for repeated rounds of additional interviews. Curious about IAD's conduct, Richard Barry and Andrew Leonard, the attorneys representing the various officers, inquired of Captain Nocchiero what IAD thought was "the truth." Nocchiero said that he could not answer the question, and then walked out of his office. He returned shortly, and ushered the two attorneys into Chief Henderson's office. In response to the same question, according to Richard Barry, Chief Henderson became animated and stated, "I want the sergeant . . . the white sergeant." Neither Barry nor Leonard had any doubt that Henderson meant Moran. Leonard was convinced that Chief Henderson was driving the internal investigation. Henderson made clear to the attorneys that officers changing their statements would not be prosecuted for any inconsistencies with their first statements.

Among those interviewed was Officer T.J. DuPree. Officer DuPree had been present at the Bell beating, and had afterwards corroborated Officer Booker's report on the incident. That report contained several inaccuracies, including some relating to Officer DuPree's conduct. In his initial interview, Officer DuPree stood by the report, encouraged to do so by Moran. When recalled for a subsequent interview, DuPree was working the night shift. Every morning for a week, after finishing his shift, he was required to report to IAD, where he was left to sit without speaking to anyone. Having seen Chief Henderson's statement to the media, Officer DuPree knew that the Department had committed itself to punishing a wrongdoer. He also knew through the "rumor mill" that the Department was after Moran. Knowing that in his first statement he had corroborated Booker's inaccurate report, DuPree again spoke with IAD on May 8, 1997, heeded their repeated exhortations to give them "the truth" and implicated Moran. He then immediately recanted that implication and restated that Moran had

acted properly. At trial, DuPree testified he changed his statement and implicated Moran for fear of losing his job.

Shortly after hearing Officer Greene's Saturday night statement, and while IAD was still interviewing officers, Chief Henderson took Officer Greene, Major Hawkins, Captain Nocchiero and two IAD investigators to speak with Dee Joyce-Hayes, the Circuit Attorney for the City of St. Louis, to report Moran's alleged wrongdoing. Henderson did this despite having the statements of fifteen other officers, none of which implicated Moran. After receiving Officer DuPree's May 8th statement, Chief Henderson suspended Moran without pay.

Moran was ultimately accused of having assaulted Bell by striking him about the head with an ASP baton and by spraying mace in his face, both after Bell had ceased resisting. On May 16, 1997, the Metropolitan Police Department Bureau of Professional Standards charged Moran with assault, use of excessive force with an ASP baton, and use of excessive force with mace. Chief Henderson and Major Hawkins signed off on these charges. On June 5, 1997, Moran was indicted by a grand jury on criminal charges of felony assault, misdemeanor assault and conspiracy to hinder prosecution.

The charges against Moran were assigned to Assistant Circuit Attorney Douglas Pribble. After reviewing the evidence, Pribble wrote a memorandum to Circuit Attorney Joyce-Hayes which detailed the inconsistencies between the various officers' statements, thoroughly discredited Greene's testimony, and demonstrated how the evidence not only failed to build a case against Moran, but in fact completely exonerated him. The prosecution proceeded, and Pribble subsequently left the circuit attorney's office.

In April of 1998, a jury acquitted Moran of all criminal charges. On May 22, 1998, the St. Louis Post-Dispatch reported that the Police Department had reached a $250,000 settlement with the Bell family. The paper reported this to be the largest

settlement ever paid by the Department. On May 18, 1998, one year after the Bureau of Professional Standards had first filed its administrative charges against Moran, and two weeks before his administrative hearing, a fourth charge of failure to properly exercise his duties as a police sergeant was added against him. This additional charge was also authorized by Major Hawkins and Chief Henderson.

Moran's administrative hearing occurred on June 4 and 5, 1998, and July 15, 16, 28, 29 and 31, 1998. At this hearing, numerous witnesses favorable to Moran who had testified for him at his criminal trial asserted their Fifth Amendment privilege and declined to testify. They did so because shortly before the hearing began they had been informed that they were the targets of additional internal procedures. The hearing officer ultimately recommended acquittal on the assault and excessive force charges. However, he recommended sustaining the fourth charge on the grounds that Moran directed Booker to file a false report regarding the Bell beating. The Board of Police Commissioners accepted the first three recommendations. As to the fourth, however, the Board sustained the charge, but on wholly different grounds. The Board concluded that while it could not tell who beat Gregory Bell, or when or how, it was certain that some beating occurred after Bell had been subdued. The Board further concluded that Moran had been in charge. The Board therefore found Moran guilty of failure to properly exercise his duties for failing to prevent the purported illegal beating. As punishment, the Board suspended and demoted Moran. As provided under Missouri law, Moran appealed this process to the Missouri Circuit Court for the City of St. Louis which affirmed the Police Board's action.

In late 1998 and early 1999, the Department meted out suspensions of one to three days to various officers for conduct related to the Bell beating, including failure to report wrongdoing, failure to call in a canine unit, and improper performance of duty. No officer, however, was ever punished for assaulting Bell.

Moran sued the defendants under 42 U.S.C. § 1983, alleging that they conspired to and did violate his right to substantive due process under the Fourteenth Amendment.

-6-

He also alleged a state law malicious prosecution claim. This litigation does not revisit his innocence. Rather, it questions the investigation defendants initiated and continued into his conduct that day, and the ensuing criminal and administrative prosecutions.

Prior to trial, Moran was denied various items of discovery under assertions of privilege. Both prior to and at trial, the district court excluded various items of evidence Moran sought to admit. After hearing Moran's case, the district court granted defendants judgment as a matter of law. Moran now appeals these rulings. He also appeals the district court judge's refusal to recuse himself after Moran discovered that the district court judge enjoyed a social relationship with one of the named defendants.

II.

We start with the district court's disposition of this case. A district court may grant judgment as a matter of law once a party has been fully heard on an issue if the party has failed to establish any legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue. Fed. R. Civ. P. 50(a)(1). Such a ruling is appropriate only "when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the non-moving party." Ehrhardt v. Penn Mut. Life Ins. Co., 21 F.3d 266, 269 (8th Cir. 1994) (quotation omitted). We review a grant of a judgment as a matter of law de novo. Heintzelman v. Runyon, 120 F.3d 143, 145 (8th Cir. 1997). In doing so we do not weigh the evidence, but draw all factual inferences in favor of the nonmoving party. Lytle v. Household Mfg., Inc., 494 U.S. 545, 554 (1990).

Moran alleged the defendants conspired to and did violate his federally secured rights in violation of 42 U.S.C. § 1983. The Fourteenth Amendment guarantees "[s]ubstantive due process[, which] prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir.1998) (en banc). To that end, the Fourteenth Amendment prohibits "conduct that is so outrageous that it shocks the

conscience or otherwise offends 'judicial notions of fairness, [or is] offensive to human dignity.'" Id. (quoting Weimer v. Amen, 870 F.2d 1400, 1405 (8th Cir. 1989)) (brackets in original). Moran also alleged a malicious prosecution claim, which arises under Missouri law upon a showing that a defendant initiated or continued a prosecution without probable cause. King v. Ryals, 981 S.W.2d 151, 154 (Mo. Ct. App. 1998). The district court acted correctly only if, viewed in a light most favorable to Moran, the evidence he introduced failed to create any legally sufficient evidentiary basis for a reasonable jury to find for him on any of his claims. After a thorough review of the record, we find the district court erred.[3]

Viewing the record in the appropriate light, we find Moran established a plausible case for each of his contentions. Moran introduced evidence of a Department that publicly and financially committed itself to producing a culprit for an alleged wrongdoing before any such wrongdoing was actually established. He produced evidence of violated procedures, of pressures placed on officers to corroborate the Department's official line, and of a hasty condemnation of Moran himself. Moreover, he established that at various times, certain defendants knew of evidence proving his innocence. In short, drawing all inferences in his favor, a reasonable jury could conclude that some or all of the defendants intentionally set Moran up as a scapegoat.

It may well be that learning of a brutal beating, Chief Henderson drew a reasonable conclusion that wrongdoing had occurred, and that under the circumstances, given Barry Greene's statement, and facing a "blue wall of silence," the Chief and IAD

---

[3]The district court entertained only the briefest of oral arguments on the defendants' motion before granting it. The district court apparently wrapped the malicious prosecution claim and the section 1983 claim together, hearing argument only as to the former, yet applying the same standard to both. In a one-page order, the district court, without explanation, dismissed all of Moran's claims. As a matter of procedure, the district court should have articulated grounds for this decision. Dominium Mgmt. Servs. Inc. v. Nationwide Housing Group, 195 F.3d 358, 366 (8th Cir. 1999).

acted reasonably. It may also be that many of the operative decisions lay not in the hands of the defendants but with the prosecuting attorney. Such questions, however, along with whether the defendants' conduct was so wrongful as to shock the conscience, and whether probable cause existed, depend on interpretation of the evidence, the drawing of inferences and evaluations of witness credibility. These remain the province of the jury. Accordingly, we remand for a new trial.

## III.

We turn next to the recusal question. At her deposition, Board member Anne-Marie Clarke disclosed that she and the district court judge know each other socially. She admitted having known the judge for over twenty-one years. She testified that over the years they had visited each others homes up to ten times each. Clarke also testified that she, the district court judge, and her co-defendant Wayman Smith appeared at the same social events. Given these discoveries, Moran made a motion for recusal, which the district court denied without comment. Moran appeals this decision.

We commit the recusal decision to the sound discretion of the district court, and review that decision only for abuse of discretion. In Re KPERS, 85 F.3d 1353, 1358 (8th Cir. 1996). A judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This restriction is intended to "promote public confidence in the integrity of the judicial process." Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 860 (1988). Whether a judge actually has a bias, or actually knows of grounds requiring recusal is irrelevant–section 455(a) sets an objective standard that does not require scienter. Id. at 859-60. We have recast the question as "whether the judge's impartiality might reasonably be questioned by the average person on the street who knows all the relevant facts of a case." In Re KPERS, 85 F.3d at 1358.

By enacting section 455(a), Congress sought to eradicate not only actual but also the appearance of impropriety in the federal judiciary. To that end, Congress permitted

parties to waive objection, on the record, of any such conflict. 28 U.S.C. § 455(e). Thus, where judges have fully disclosed potential conflicts, and have then retained their mandate in a case, we have been solicitous of their discretion. In In Re KPERS, for instance, the district court immediately informed the parties when a potential conflict arose, and disqualified himself from a decision involving those parties. 85 F.3d at 1355. Moreover, knowing of potential conflicts, the parties passed up opportunities to object. Id. at 1356. There, we affirmed the district court judge's refusal to recuse himself.

It is true that "[a]n unfavorable judicial ruling . . . does not raise an inference of bias or require the trial judge's recusal." Harris v. Missouri, 960 F.2d 738, 740 (8th Cir. 1992) (declining to accept judge's refusal to accept a plea agreement as evidence of bias); accord Holloway v. United States, 960 F.2d 1348, 1350-51 (8th Cir. 1992) (holding that granting a reduced sentence to one but not another defendant, and being friends with another judge who allegedly "harbored a bias" against defendant, were not grounds for finding bias). However, the inquiry whether a reasonable person, knowing all the relevant facts, would discern potential impropriety certainly warrants consideration of a judge's course or pattern of rulings, and also of the judge's course of conduct.

We are troubled by the record in this case. The district judge's appearances at the same social events as Clarke and Smith brooks little mention. Judges, attorneys and public officials will often share public appearances. This does little to create the appearance of impropriety. The social relationship, however, is more serious. The image of one sitting in judgment over a friend's affairs would likely cause the average person in the street to pause. That the judge and Clarke enjoyed a friendship of sufficient duration as to warrant reciprocal visits to one another's homes only exacerbates the problem. We find particularly worrisome the district court's failure to disclose this conflict himself, as permitted by section 455(e). Moreover, the record suggests a fractious relationship between the district court and Moran's attorneys. We do, however, have the utmost faith in the district court's ability to rule impartially, and

have imposed on ourselves an obligation to reverse a district court only where we can say with certainty that it has abused its discretion. Accordingly, rather than remand to a different judge, we remand this question to the district court with the suggestion that it revisit and more thoroughly consider and respond to Moran's recusal request.

IV.

Moran next appeals various evidentiary rulings. We review a district court's evidentiary decisions for abuse of discretion. Radecki v. Joura, 177 F.3d 694, 696 (8th Cir. 1999). In order to warrant that review, however, a party must properly preserve an issue below with an offer of proof unless the evidence was excluded pursuant to a motion in limine. Fed. R. Evid. 103(a). Additionally, an issue must be presented here in a meaningfully developed manner. Bratton v. Roadway Package Sys., Inc., 77 F.3d 168, 173 n.1 (7th Cir. 1996).

Moran appeals different exclusions with varying degrees of specificity. Were it not for our disposition of the first issue above, we would not likely reach many of his more elliptical arguments. However, our remand for a new trial wipes the evidentiary slate clean, and permits Moran to re-argue the admissibility of each item to the district court. We therefore decline to take up each ruling separately.

We do note, though, for clarity on remand, that were we to reach Moran's arguments we would likely find error with at least some of the district court's rulings. The district court first excluded significant amounts of evidence on the basis that it regarded whether Moran was actually innocent. We agree that evidence probative solely for that purpose would be irrelevant to the questions of whether probable cause existed for a prosecution and whether the defendants' conduct was shocking. However, some of the evidence the district court excluded, for instance whether Chief Henderson was ever aware of the 911 dispatcher tape recordings, seems probative both to prove Moran's innocence and also to the questions at issue in this case. Such evidence should be admitted.

-11-

The district court also excluded evidence on the grounds that it related solely to the administrative charges brought against Moran and appealed by him to the Missouri state courts. The district court ruled that evidence relating to those charges should be excluded because those claims were res judicata. As we are remanding for a new trial, the district court will also have an opportunity to revisit these rulings. We pause only to note that whether a claim is res judicata does not dispose of the question of whether evidence relating to that claim is relevant or irrelevant to other current claims.

V.

Moran also appeals the district court's refusal to order defendants to produce two types of documents–IAD investigative reports and the minutes of closed Board meetings. To protect the former, the defendants assert governmental and work product privileges. As to the latter, they assert the attorney-client privilege. Moran asserts the district court erred in sustaining these claims of privilege, or should at least have undertaken an in camera review of the purportedly privileged documents.

We review a district court's discovery rulings for abuse of discretion. Bunting v. Sea Ray, Inc., 99 F.3d 887, 890 (8th Cir. 1996). We will grant a new trial on the basis of erroneous discovery errors only where the errors "amount to a gross abuse of discretion resulting in fundamental unfairness." Id. Our review is thus both narrow and deferential. Id. We similarly rely heavily on the district court's discretion in deciding whether to conduct an in camera review. United States v. Phillips, 854 F.2d 273, 277 (7th Cir. 1988). Having reviewed the record, we cannot say that the district court abused its discretion to such a degree as to warrant a new trial. However, we have already determined that this matter should be remanded for a new trial on other grounds. As with the evidentiary rulings discussed above, the district court will be able to revisit these rulings upon Moran's motion. On appeal, however, Moran has not stated a case sufficiently compelling to persuade us that the district court committed error in not conducting an in camera review.

This matter is reversed and remanded to the district court for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.