213 F.Supp.2d 1067 (2002)
Thomas MORAN, Plaintiff,
v.
Anne-Marie CLARKE, et al., Defendants.
No. 4:98-CV-556 CAS.
United States District Court, E.D. Missouri, Eastern Division.
August 2, 2002.
*1068 C. John Pleban, Partner, Greensberg & Pleban, St. Louis, MO, Mark H. Neill, St. Louis, MO, Stanley E. Goldstein, Eli Karsh, Liberman & Goldstein, Clayton, MO, for Plaintiff.
Erin M. Matis, Gallop & Johnson, Clayton, MO, Joy Urbom Taylor, Greensfelder & Hemker, St. Louis, MO, Priscilla F. Gunn, Rabbitt & Pitzer, St. Louis, MO, for Defendants.

MEMORANDUM AND ORDER
SHAW, District Judge.
This case has been remanded to this court for retrial and, among other things, reconsideration of plaintiff Thomas Moran's recusal request. In preparing to undertake these responsibilities, this court is compelled to examine the facts and proceedings which weigh heavily on the mind of the undersigned.

I.

Factual and Procedural Background
On April 14, 1997, St. Louis police officers mistook a mentally impaired teenager, Gregory Bell, for a burglar in his own home. During his arrest, Bell resisted and was left seriously injured with severe head lacerations and a broken ankle. Within three days, Police Chief Ronald Henderson publicly apologized for the mistake and promised to take appropriate action if there was any wrongdoing. On April 19, 1997, Police Officer Barry Greene gave a tape-recorded statement to Chief Henderson, Major Gregory Hawkins and Captain Paul Nocchiero that he saw Sergeant Moran assault Gregory Bell. The previously submitted police report had placed Moran at the scene only after Bell was outside his home.
Henderson, along with Hawkins, Nocchiero and other officers, took Greene to speak with the prosecuting attorney for the City of St. Louis, Circuit Attorney Dee Joyce-Hayes. Joyce-Hayes subsequently took the matter to a grand jury, which issued an indictment against Moran. During the St. Louis Police Department's continuing investigation, Attorney Richard Barry, who represented Moran, and Attorney Andrew Leonard, who represented other officers, spoke with Chief Henderson. Attorney Barry stated that Chief Henderson said he wanted "the *1069 white sergeant." Attorney Leonard stated that he could not recall a racial overtone or any reference to "the white sergeant" during this same conversation. Chief Henderson denied making such a statement.
Moran was criminally prosecuted by the Circuit Attorney's Office and was acquitted after trial by jury in May of 1998. Thereafter, in June and July of 1998, a St. Louis Police Department Administrative Hearing Officer reviewed charges against Moran. The Hearing Officer recommended to the Board of Police Commissioners that Moran be acquitted on the assault and excessive force charges, but the charges that Moran directed another officer to file a false report on the Bell beating be sustained. The Board accepted all of these recommendations and further concluded that Bell was beaten after he had been subdued by police officers, Moran was on the scene and was in charge at the time and, therefore, Moran was guilty of failing to exercise his authority to prevent the beating of Bell. The Board punished Moran by sustaining his earlier suspension without pay and demoting him to patrolman.
Moran filed suit against eighteen defendants in this court alleging that they conspired to and did violate his constitutional right to substantive due process, and maliciously prosecuted him. Thereafter, Moran took the deposition of Anne-Marie Clarke, President of the Board of Police Commissioners, in which she was asked the following questions:
Q: Do you know Charles Shaw? The judge?
A: Judge Charles Shaw, yes.
Q: Are you social friends with him?
A: Yes.
Q: Has he been to your home?
A: Yes.
Q: How many times?
A: I don't know.
Q: More than ten?
A: No, not more than ten.
Q: Have you been to his home?
A: Yes.
Q: More than ten times?
A: I don'tI have known him twenty-some years. I don't know.
Q: A very long time?
A: Yes, a very long time.
Q: I apologize for asking this question, but have you ever discussed this case with him?
A: Judge Shaw?
Q: Yes.
A: No.
Q: Wayman Smith. Have you ever been together with Wayman Smith and Judge Shaw in a social event of any kind?
A: The three of us?
Q: Yes.
A: I'm sure we have. We are all members of the bar.
Q: Do you know whether Wayman Smith is a close personal friend of Judge Shaw's?
A: I know that we would all, they would be acquainted. I don't believe close personal friends, no.
Q: Were they ever, two of them ever together at your home?
A: I am sure they probably would have been.
MR. GOLDSTEIN: No further questions . . . .
Clarke Dep. at pp. 49-50.
Based on these questions and answers, Moran requested that this court recuse itself from the case. The request was denied.
Following the presentation of Moran's evidence and a motion from defendants to grant judgment as a matter of law, this court dismissed the case. Moran appealed the dismissal and other rulings. The appeal was heard and decided by a threejudge *1070 appellate panel, Moran v. Clarke, 247 F.3d 799 (8th Cir.), vacated and reh'g granted, 258 F.3d 904 (8th Cir.2001), and was reheard by the Eighth Circuit en banc. The full court by a majority of six to four reversed and remanded the case. Among other things, the appellate court directed this court to "revisit and more thoroughly consider and respond to Moran's recusal request." Moran v. Clarke, 296 F.3d 638, 649 (8th Cir.2002) (en banc).

II.

The Recusal Issue
Based upon Moran's request for recusal and the deposition of Clarke, the appellate majority stated the following:
We are troubled by the record in this case. The district judge's appearance at the same social events as Clarke and Smith brooks little mention. Judges, attorneys and public officials will often share public appearances. This does little to create the appearance of impropriety. The social relationship, however, invites more scrutiny. The image of one sitting in judgment over a friend's affairs would likely cause the average person in the street to pause. That the judge and Clarke enjoyed a friendship of sufficient depth and duration as to warrant several reciprocal visits to one another's homes only exacerbates the problem. We find particularly worrisome the district court's failure to disclose this conflict himself, as permitted by section 455(e). Moreover, the record suggests a fractious relationship between the district court and Moran's attorneys. We do, however, have the utmost faith in the district court's ability to rule impartially, and have imposed on ourselves an obligation to reverse a district court only where we can say with certainty that it has abused its discretion. Accordingly, rather than remand to a different judge, we remand this question to the district court with the suggestion that it revisit and more thoroughly consider and respond to Moran's recusal request.
Moran, 296 F.3d at 649 (emphasis added).
The majority assumes a conflict exists, but the facts show otherwise. Neither Clarke nor the undersigned have ever been in each other's homes on a personal, family or "reciprocal" basis. Clarke was last present in the undersigned's home eight years ago in 1994, when I permitted the Mound City Bar Association to host a reception for a candidate running for the Presidency of the National Bar Association. Approximately one hundred people attended the event in my home, almost all of whom were members of the bar. Between 1987 and 1993, the undersigned was present in Clarke's home on three occasions. The first occasion was a Missouri Bar Association reception in conjunction with the annual Missouri Bar Conference. The second was a Mound City Bar Association social event. The third was a birthday party for Clarke's husband, who had been President of the St. Louis Board of Education. At each of these gatherings, there were between one to two hundred guests, most of whom were members of the bar or public officials.
Between 1977 and 1978, Clarke and the undersigned were present in each other's homes two to three times as part of a group meeting of approximately half a dozen people attempting to plan and organize an effort to encourage young African-American professionals in St. Louis to meet, network and socialize. Subsequently, during this same period of time, Clarke was present in the undersigned's home for such a social gathering, attended by more than one hundred people.[1] This court's *1071 relationship with Clarke was based on our being members of the bar and of the same small generation of African-American attorneys in St. Louis, rather than on personal matters.
With all due respect, this court's faith in the appellate majority herein has been shaken. While the majority claims to have the "utmost faith" in this court's impartiality, it strongly suggests a lack of faith by stating that it was troubled and worried by "this conflict," which was "exacerbated" by this court's failure to disclose the alleged conflict itself.
Webster's Third New International Dictionary 816 (1965) defines "faith" as a "firm or unquestioning belief in something for which there is no proof" or "confidence: esp: firm or unquestioning trust or confidence in the value, power or efficacy of something." Another authority described it in the following manner:
[F]aith is the substance of things hoped for, the evidence of things not seen. For by it the elders obtained a good report.
Hebrews 11:1-2 (King James).
What was seen by the appellate majority was this court's ruling that its relationship with Clarke was insufficient reason for recusal. What was unseen was this court's reasoning for the conclusion. "Faith," and particularly "utmost faith," would seem to require belief or confidence that this court would not reach such a conclusion without a basis. Having such faith, my appellate brethren could have required that I revisit this issue and state my reasoning. Instead, they chose to declare themselves "troubled," and hastily surmised without support in the record that my relationship with Clarke was a friendship of "sufficient depth" that it "warrant[ed] several reciprocal visits to one another's homes." They further found "particularly worrisome" the undersigned judge's "failure to disclose this conflict himself." The majority panel's professing to have "the utmost faith in the district court's ability to rule impartially" is wholly inconsistent with its use of such words as "troubled," "worrisome" and "exacerbate." On the contrary, what seems apparent here is an utter absence of faith.[2]
The majority has generated an image of a federal district judge "sitting in judgment over a friend's affairs." This image more than gives one pause. It paints an extremely negative picture of this court's impartiality, and also equates Clarke's service on the St. Louis Board of Police Commissioners with her personal affairs. This picture is all the more distorted when one recognizes that there was no evidence, reference or even a hint in the record that Clarke acted other than as a member of the Police Board in reviewing and acting on the Hearing Officer's administrative recommendation. Full scrutiny of the record would reveal that although Clarke was sued in her individual and official capacities, as were all the Board defendants, she was primarily a nominal defendant in this case, who was not even called as a witness in plaintiff's case. Cf. Gray v. University of Ark. at Fayetteville, 883 F.2d 1394, 1398 (8th Cir.1989) (district court did not err in refusing to recuse itself from a case in which one defendant, a member of the university board of trustees, had been the judge's law partner five years previously, but was not expected to testify and no *1072 judgment would be entered against him personally); see also United States v. Lovaglia, 954 F.2d 811, 816-17 (2d Cir.1992) (district judge's social relationship with family whose businesses were victims of criminal defendants' violations of RICO did not require recusal where relationship ended seven or eight years prior to sentencing, the judge had no specific knowledge of the contested facts and allegations concerning the social relationship were not "outcome-determinative" in the proceedings). In this case, there is little mention of Clarke in the record other than in reference to her relationship to this judge, with special emphasis on being in each other's homes.
This court recognizes and embraces the established standard for recusal of a judicial officer. Recusal is committed to the sound discretion of the trial judge and a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This issue has been cast as "whether the judge's impartiality might reasonably be questioned by the average person on the street who knows all the relevant facts of a case." In re Kansas Pub. Employees Retirement Sys., 85 F.3d 1353, 1358 (8th Cir.1996).
It is abundantly clear that the undersigned should have fully addressed his relationship with Clarke on the record in response to Moran's recusal request. The undersigned regrets and apologizes for this oversight. I am mindful, however, that judges, who are "keenly aware of the obligation to decide matters impartially, `may regard asserted conflicts to be more innocuous than an outsider would.'" Recusal: Analysis of Case Law under 28 U.S.C. §§ 455 and 144 (Federal Judicial Center 2002) (quoting United States v. DeTemple, 162 F.3d 279, 287 (4th Cir.1998), cert. denied, 526 U.S. 1137, 119 S.Ct. 1793, 143 L.Ed.2d 1020 (1999)); see also United States v. Jordan, 49 F.3d 152, 156-57 (5th Cir.1995) (the average person on the street as "an observer of our judicial system is less likely to credit judges' impartiality than the judiciary"); In re Mason, 916 F.2d 384, 386 (7th Cir.1990) (lay observer would be less inclined to presume a judge's impartiality than other members of the judiciary).
It is obvious that "all the relevant facts" were not known in this case, yet the appellate majority did not hesitate to decide that there was a conflict. Had the majority acted with restraint and allowed "all the relevant facts" to be set forth before assuming the worst, unnecessary and wrongful damage to the reputation and integrity of a fellow Article III Judge could have been avoided.[3] Was there not leeway for a modicum of consideration to be accorded to the district court? Perhaps, on the other hand, allowing this court the opportunity for "more scrutiny" with the suggestion that it "revisit and more thoroughly consider and respond to Moran's recusal request" was intended to be exactly that.
A judge is presumed to be impartial. "Impartiality of course lies at the heart of our system of justice ... it is what makes the system work ...." Denelle J. Waynick, Judicial Disqualification: The Quest for Impartiality and Integrity, 33 How. L.J. 449, 460 (1991) (quoting Judicial Inquiry and Review Bd. of Supreme Court of Pa.v. Fink, 516 Pa. 208, 532 A.2d 358 *1073 (1987)). "[T]he law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea." Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 820, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (quoting 3 W. Blackstone, Commentaries *361.) Given this presumption of honesty and integrity, surely there should be room to consider that an error in failing to address a question as to the judge's impartiality is inadvertent. See Liljeberg v. Health Svcs. Acquisition Corp., 486 U.S. 847, 862, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988) ("As in other areas of the law, there is surely room for harmless error committed by busy judges who inadvertently overlook a disqualifying circumstance.").
A judge's involvement with other attorneys in bar association activities is not a basis for recusal. Indeed, the commentary to Canon 4 of the Code of Conduct for United States Judges (1999) encourages judges to "contribute to the improvement of the law, the legal system, and the administration of justice.... [T]he judge is encouraged to do so, either independently or through a bar association, judicial conference, or other organization dedicated to the improvement of the law." A judge should not be required to withdraw from all social relationships and live in seclusion. See Leslie W. Abramson, Appearance of Impropriety: Deciding When a Judge's Impartiality "Might Reasonably Be Questioned," 14 Geo. J. Legal Ethics 55, 95 (Fall 2000). Furthermore, it should be common knowledge, especially among attorneys, that a judge knows many of his or her community's attorneys and public figures. See id. at 95-96. This is even more likely when such individuals are African-American, as there is a much smaller community. This is the reality of public life, which in and of itself should not raise questions about the judge's impartiality. If recusal were required in such situations, a judge might be disqualified from presiding over most cases in which local parties or public figures are involved. Id.
One of the most respected African-American jurists of this nation, former Chief Judge of the Third Circuit, A. Leon Higgenbotham, Jr., when asked to recuse himself stated:
"[A judge] must have neighbors, friends and acquaintances, business and social relations, and be a part of his day and generation. * * * [t]he ordinary results of such associations and the impressions they create in the mind of the judge are not the `personal bias or prejudice' to which the [judicial disqualification] statute refers."
Commonwealth of Pennsylvania v. Local Union 542, Int'l Union of Operating Eng'rs., 388 F.Supp. 155, 159 (E.D.Pa. 1974) (citation omitted). See also, Harry T. Edwards, Race and the Judiciary, 20 Yale Law & Pol'y. Rev. 325, 326 (2002) (quoting Commonwealth of Pennsylvania and commenting that in Judge Edwards' view, to decide cases as well as they are able, judges "should maintain a diverse group of friends, travel widely, give speeches ..., and seek out opportunities for the exchange of ideas.")
This court finds that as a matter of law, pursuant to 28 U.S.C. § 455(a), its relationship with Clarke is an insufficient basis for recusal from this case. The appearance of the undersigned and Clarke at the same bar association functions or large social events, whether or not hosted in each other's homes, and the several small group meetings of almost twenty five years ago, falls far short of a relationship which would cause a reasonable person knowing all the facts to believe that the undersigned might not be impartial. In sum, the relationship does not require recusal. Accordingly, having reconsidered the issue, this court will deny Moran's request for recusal.

*1074 III.

The Racial Issue
This case starts with race, becomes embroiled with race and climaxes with race. The racial context of this case is as follows:
1. Gregory Bell, a mentally impaired African-American teenager who was mistaken for a burglar in his own home, is seriously injured by the police.
2. Defendant Chief of Police Henderson, an African-American, publicly apologizes for the mistake and promises to take appropriate action.
3. During the police department's investigation, a "white sergeant," Thomas Moran, is accused by two police officers (Barry Greene and Terrence DuPree[4]) of striking Bell.
4. Richard Barry, one of Moran's attorneys, says that during the investigation Chief Henderson stated he wanted "the white sergeant."
5. After Moran's criminal trial and acquittal and a police board suspension and demotion, Moran files suit in this court, and the case is randomly assigned to the undersigned, an African-American judge.
6. Moran's attorneys seek to disqualify this judge by inquiring during defendant St. Louis Police Board President Clarke's deposition about her relationship with the judge, as well as fellow board member Wayman Smith, III's relationship with the judge. Both Clarke and Smith are African-American attorneys.
7. This court denies the request for recusal without explaining its relationship to Clarke or Smith. After the presentation of Moran's evidence, this court dismisses his case.
8. On rehearing of the appeal en banc, a majority of six white men conclude that Moran established a plausible case of, among other things, "improper consideration of his race" by a police department headed by an African-American. See Moran, 296 F.3d at 648.
9. The appellate minority of four judges, two white men, one white woman and an African-American man, disagrees with the majority's substantive due process analysis and observes that the majority "introduces possible racial bias ... into the equation, when Moran neither pleaded an equal protection claim nor alleged in his complaint that any defendant's conduct was racially motivated." Id., at 654. The minority describes the "I want the white sergeant" statement relied on by the majority as "one scrap of testimony that has little or no credibility." Id.
Despite the foregoing, the majority's decision claims ignorance of the racial issue by stating that "[t]he record on appeal does not clearly set forth the race of the various parties and participants ...." Moran, id. at 645. It has often been said that justice is blind but the appellate majority appears to embrace willful blindness with respect to issues of race. It is patently obvious which of the primary protagonists in this case are black and which are white. The appellate majority places great weight on evidence that Chief Henderson said he wanted the "white sergeant." Moran, 296 F.3d at 645. The four dissenting judges recognize that Chief Henderson is African-American. The majority explicitly recognizes that plaintiff Moran is white. Id., at 645-46. As to Gregory Bell, the majority refers to a May 22, 1998 report of the Police Department's monetary settlement with the Bell family in the St. Louis Post-Dispatch. Id., at 641-42. This reference, along with the surrounding facts and circumstances of the case, raises an inference that the appellate *1075 majority may also have some awareness of Bell's race.
With regard to the race of the judges herein, we all know each other. As to Clarke and Smith, the deposition of Clarke allows for an inference as to their race. Furthermore, Clarke and Smith are prominent, well respected and publicly active attorneys in the St. Louis community.
It appears that the appellate majority may be in denial with its refusal to acknowledge the race of the parties and participants involved, or perhaps wishes to appear color-blind and above issues of race. In any event, the undersigned is at a loss to explain the majority's justification and reasoning for choosing to demean the character of this court with such zeal. The majority goes beyond inference and resorts to rank speculation with regard to this court's relationship with Clarke. The undersigned is left with the deeply troubling impression that had I been white, or had plaintiff Moran been African-American, and all the other facts of this "hard case" remained the same, the majority's opinion on the recusal issue would have been significantly different.
If this court has wrongly inferred that race played a role in the majority's decision, please allow it to apologize. Yet, at present this court remains offended, insulted, troubled and confused[5] not only by the attack on its impartiality, but also by the disparaging tone of the majority opinion, its conflict-supportive word selection,[6] and *1076 its blatant refusal to acknowledge the race of the participants, much less the underlying racial issues so clearly present in this case.
Over the undersigned's fifteen years as a trial judge, I have strived to be fair and impartial, not allowing race to have an impact on my decisions in this or any other case. Impartiality is the life blood of our judicial system. It is the basis of the respect that our institution enjoys. Clearly "[t]here is no `race card' to be played in judicial deliberations." Edwards, supra, at 327, 330. The decisions of judges, including the undersigned, should not depend on their race or on the race of parties and participants. We are a nation of laws, not men. Nevertheless, as the dissenting opinion aptly notes, "hard cases make bad law." Moran, 296 F.3d at 651. The distinguished African-American jurist, Judge Harry T. Edwards of the District of Columbia Circuit Court of Appeals, has observed that "in `very hard' cases it can be argued that race may at times have a predictable impact on judicial decision making." Edwards, supra, at 327.

IV.

Conclusion
The recusal and racial issues discussed herein weigh heavily on this court's mind. The disrespect that this court feels has been visited upon it by fellow Article III judges makes the orderly administration of justice extremely difficult, if not impossible, in further presiding over this case. This court has struggled with and prayed over its heretofore expressed concerns, and affirms its sincere commitment to its judicial responsibilities, the fundamental requirement of judicial impartiality, and the rule of law. Nevertheless, these concerns have caused this court such extreme discomfort that it is inappropriate for the undersigned to have any further involvement with this case. For this reason, this court hereby recuses itself. Accordingly,
IT IS HEREBY ORDERED that the Clerk of the Court randomly reassign this case to another judge.
NOTES
[1] The occasions on which Clarke and the undersigned have been present in each other's homes now span some twenty-five years. The occasions referred to herein are all that the undersigned recalls. If there are any other such occasions, they are of the same nature and are not recent.
[2] What does it profit, my brethren, though a man say he hath faith, and have not works?

....
[F]aith, if it hath not works, is dead, being alone.
James 11:14 and 17 (King James).
[3] Good name in man and woman, dear my lord,

Is the immediate jewel of their souls:
Who steals my purse steals trash; `t is something, nothing;
`T was mine, `t is his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him
And makes me poor indeed.
William Shakespeare, Othello, Act 3 Sc. 3.
[4] Trial tr., Vol. III at 115, 125, 136.
[5] The court is confused by the majority's reference to "a fractious relationship between the district court and Moran's attorneys." Moran, 296 F.3d at 649. The record reflects that throughout the trial, Moran's attorneys persisted in seeking to revisit Moran's acquittal of criminal wrongdoing, despite this court's clear and unequivocal rulings excluding this evidence. Further, although the majority agrees that "[t]his litigation does not revisit [Moran's] acquittal of criminal wrongdoing," id., at 642, it gives probative value to the excluded memorandum of Assistant Circuit Attorney Douglas Pribble, id., at 641-42, which questioned the merits of the criminal case. Obviously, Pribble's superior, Circuit Attorney Dee Joyce-Hayes, thought differently and decided to seek an indictment and have Moran criminally prosecuted. Id., at 656-57. In its opinion, the majority cited one of the three newspaper articles this court excluded at trial. See id., at 641-42. One of the excluded articles the majority neglected to cite was from the March 3, 1998 edition of the St. Louis Post-Dispatch, which reported that Assistant Circuit Attorney Pribble had written the memorandum recommending further investigation. The article states in part, "Joyce-Hayes said Monday that Pribble's memo prompted a thorough re-examination of the case. `We do not believe the evidence supports (Pribble's) concerns,' Joyce-Hayes said."
[6] For example, the majority disparagingly refers to this court entertaining "only the briefest of oral arguments" on the motion for judgment as a matter of law. Moran, 296 F.3d at 643 n. 4. This court is unaware of any rule or guideline as to the length of time for oral argument, particularly when the court has reviewed a summary judgment motion, conducted a lengthy pretrial conference, and heard all of the plaintiff's evidence over several days. One of the concurring opinions refers to the district court's "hasty" decision, id. at 651-52, but four of the ten appellate judges agreed with the decision following careful deliberation.

The majority opinion's discussion of the recusal issue uses words selected to support its conclusion that a conflict exists. The reference to "discoveries" with regard to the court's relationships with Clarke and Smith suggests that these relationships were being concealed. Not all circuit courts of appeal have taken such an approach. See, e.g., United States v. Lovaglia, 954 F.2d 811, 816 (2d Cir.1992) (where question of district judge's social relationship with owner of business crime victim arose at hearing and the judge did not specifically mention having socialized with the owner's family, the appellants raised this as an additional appearance of impropriety. The Second Circuit disagreed, noting that the judge discussed his business and legal contacts with the victim's owner, and stated, "[T]he fact that [the judge] did not mention that he had in the past socialized with the [owners] suggests that this relationship did not strike him as important enough to explore and that the social aspect of the relationship was ... de minimis, or difficult to distinguish from the primary business relationship ....")
The majority's use of the term "reciprocal visits" suggests that the nature of the occasions when Clarke and the undersigned were in each other's homes was personal. It is noteworthy that neither Clarke nor the attorney who questioned her used the term "reciprocal" or the term "visit" during Clarke's deposition. This depiction of "reciprocal visits" bolsters the majority's "failure to disclose this conflict" accusation. (It is now apparent from the Clarke deposition that Moran's attorney was seeking to establish the appearance of a conflict, as he did not bother to question her further about the nature of the relationship, once he obtained responses that we had been present in each other's homes. Because the functions at my home and that of Clarke were predominantly attended by attorneys and public officials, it is reasonable to infer that one or more of Moran's four trial attorneys may also have been present or at least were aware of the functions.) It is also noteworthy that the majority failed to mention that Clarke stated in response to a question whether she had ever been at a social event with Smith and the undersigned, "I'm sure we have. We are all members of the bar." Clarke Dep. at 50 (emphasis added). When asked if Smith was a close personal friend of mine, Clarke stated, "I know that we would all, they would be acquainted. I don't believe close personal friends, no." Id. Perhaps the majority felt constrained to be consistent with its commitment to view "the facts in a light most favorable to Moran," Moran, 296 F.3d at 639, and thereby made inferences that favored Moran. This court was unaware, however, that this standard of review was applicable to requests for recusal.