**Donald Kenneth FETTERLY,**
**Petitioner–Appellant,**

v.

**Dave PASKETT, Warden, Idaho State Prison; and Alan G. Lance,[*] Attorney General of the State of Idaho, Respondents–Appellees.**

No. 90–35627.

United States Court of Appeals,
Ninth Circuit.

Reargued and Submitted March 31, 1993

Submission Deferred July 9, 1993

Resubmitted Nov. 30, 1998.

Decided Dec. 31, 1998.

---

[*] Alan G. Lance is substituted for his predecessor, Jim Jones, as Attorney General, State of Idaho.

Fed. R.App. P. 43(c)(1).

Thomas J. McCabe, Westberg, McCabe & Collins, Boise, Idaho; David J. Burman, Perkins Coie, Seattle, Washington, for the petitioner-appellant.

1145

Lynn E. Thomas, Solicitor General, Office of the Attorney General of the State of Idaho, Boise, Idaho, for the respondents-appellees.

Before: SCHROEDER, LEAVY, and TROTT, Circuit Judges.

TROTT, Circuit Judge:

In 1993, we entertained an appeal by petitioner Fetterly from a denial by the district court of his petition for a writ of habeas corpus. Rather than decide the substantive claims in his petition, however, we deferred submission and issued a limited remand to the district court for further proceedings. We concluded that the district court erred in denying Fetterly a stay he requested in order to exhaust in state court newly identified federal constitutional claims. Our remand included an order to the district court to permit Fetterly to amend his petition to add newly exhausted claims.[1]

On remand, Fetterly's petition was eventually resolved by the district court as to his sentence of death. The district court ordered resentencing, and the State of Idaho acquiesced in that order. The State correctly points out, however, that Fetterly should not be resentenced until we resolve his pending habeas claims going to the validity of his convictions; and Fetterly agrees. Thus, we have stayed the district court's resentencing order, and we now proceed to the merits of his claims, each of which was rejected by the district court in 1990. In so doing, we borrow heavily without attribution from the district court's detailed Memorandum Decisions dated February 15, 1990, April 10, 1990, and August 1, 1990.[2]

The claims we evaluate are (1) whether Fetterly was denied due process as a result

1. *Fetterly v. Paskett,* 997 F.2d 1295 (9th Cir. 1993), *reh'g denied,* 15 F.3d 1472 (1994), *cert.*

*denied sub nom Arave v. Fetterly,* 513 U.S. 914, 115 S.Ct. 290, 130 L.Ed.2d 205 (1994).

2. *See Fetterly v. Paskett,* 744 F.Supp. 966 (D.Idaho 1990); *Fetterly v. Paskett,* 747 F.Supp. 594 (D.Idaho 1990).

of pretrial publicity and the trial court's denial of his multiple motions for change of venue, change of venire, and a continuance; and (2) whether his constitutional right against self-incrimination was violated by the admission in evidence of certain custodial statements he made to the police after his arrest.

# I

## Pretrial Publicity

Shortly after they were arrested for an unrelated theft, Fetterly and Karla Windsor entered Sterling Grammer's home in his absence with the intent to steal Grammer's belongings and then his car. When Grammer returned home, Fetterly savagely stabbed him to death, and he and Windsor took their victim's car and dumped his body in the Snake River. Their avowed purpose was to get a "fresh start" in life. After fishermen discovered Grammer's body, police arrested Fetterly and Windsor whom they had recently observed driving both Grammer's car and his truck.

In support of his claim that pretrial publicity deprived him of his right to a fair trial, Fetterly submits material printed in local newspapers, the *Idaho Press–Tribune* and the *Idaho Statesman*.[3] These articles, which appeared before petitioner's trial on at least fourteen occasions, basically tell all, including: (1) every element of the offense; (2) the petitioner's prior criminal record; (3) the petitioner's recent release from jail on a separate and unrelated charge; (4) the petitioner's confession; and (5) the prosecuting attorney's claim that petitioner's confession "nails [him] to the wall." The sources of this information were the prosecutor and the local sheriff.

Because of this publicity, the petitioner requested a change of venue, or in the alternative the selection of jurors from outside the area covered by the two newspapers. The trial judge denied the motions without prejudice, reserving his final decision until completion of voir dire. The purpose of the trial judge was to determine whether enough impartial jurors could be found to hear the State's case.

On the day the jury panel was summoned for the beginning of voir dire, another extensive front page headlines article appeared in the *Idaho Press–Tribune*. The article repeated much of the information of which Fetterly complains. The case was also the subject of radio and television coverage. The next morning, the first day of trial, the petitioner's counsel moved once again for a change of venue and a continuance. The motions were denied, but the trial judge did permit separate and individual voir dire of the prospective jurors.

Fetterly makes two arguments about the pretrial publicity in this case. First, he argues that it was so extensive and damaging that we should presume prejudice and grant his writ. As authority for this proposition he refers us, inter alia, to *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Second, he asserts that the record reveals actual prejudice on the part of the jury that convicted him, prejudice generated by the prosecutor and the sheriff working with the media. Relying on *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), Fetterly says he has made an adequate showing of actual prejudice to compel the conclusion that he did not have a fair trial. We disagree with him on both counts.

The district court carefully examined the relevant publicity in this case, compared it to the publicity in cases involving presumed prejudice, and concluded that the comparison did not measure up. We agree. In the main, although the publicity-most of which occurred months before the trial-was comprehensive, it was no more extensive than what usually occurs in a case such as this; and other than the prosecutor's aggressive statement about "nailing" Fetterly to the wall, the publicity was not likely-even in a small rural community-to so poison the well that a fair trial was not possible. Moreover, the publicity focused on the facts of the case, not on inflammatory material that could not have been admitted in evidence.

---

3. *State v. Fetterly*, 109 Idaho 766, 710 P.2d 1202 (Idaho 1985), reports the decision of the Idaho Supreme Court affirming Fetterly's conviction and sentence. The opinion recreates the newspaper coverage of which Fetterly complains. *Id.* at 1222–27.

The conclusive proof of this pudding is in the eating. When we examine the record for actual prejudice, we find none. The linkage that Fetterly must demonstrate does not exist. What we learn from the transcript of the voir dire of each individual juror who heard Fetterly's case is exactly what the district court learned from reviewing the same record.[4]

The following jurors were selected to hear the evidence: (1) Carol Trimble, (2) George Puga, (3) Shirley Rau, (4) Carolyn Vermaas, (5) Mary Hennis, (6) Juanita Tabor, (7) Trula Carrow, (8) Earl Wright, (9) Virginia Schroder, (10) Hazel Davenport, (11) David Knoulton, (12) Marjorie Pulley, and (13) Gloria Gonzalez (alternate who did not deliberate). As far as we can tell from the record, not one of these jurors entered this trial either tainted by publicity or with an opinion regarding Fetterly's guilt.[5]

Juror Carol Trimble had heard some facts surrounding the case; however, she had not formed an opinion. (Tr. of Voir Dire at 134–35). In addition, the facts that this juror had heard about prior to trial were facts which were introduced in evidence at trial. Juror George Puga stated that he had not read or heard anything about the case, which was supported by the fact that he did not take the local newspaper. He said, "I work graveyard during the day, and take care of my kids. I just watch very little T.V." (Tr. of Voir Dire at 141, 143). Juror Shirley Rau had read a newspaper article which contained some evidentiary facts about the case; however, it appears that the facts she could remember were introduced at trial. (Tr. of Voir Dire at 199). Juror Rau assured the court that she had not formed an opinion as to the defendant's guilt or innocence. (Tr. of Voir Dire at 199). Juror Carolyn Vermaas had read an article about someone being killed, but said, "I don't remember any of the details." (Tr. of Voir Dire at 204). She also

indicated that she had not formed an opinion. *Id.* Juror Mary Hennis did not take or read the newspaper and knew nothing about the case. She said, "I've not heard anything specific about this case other than there was a case coming up." (Tr. of Voir Dire at 68). Juror Juanita Tabor also told the court that she knew nothing about the facts of the case. (Tr. of Voir Dire at 101). Juror Trula Carrow had heard that the case was going to trial but was not aware of any specific facts. (Tr. of Voir Dire at 117–18). Juror Earl Wright had scanned over a newspaper article, but he could not remember any specific facts. (Tr. of Voir Dire at 185). Mr. Wright also stated that he had not formed any opinions concerning the defendant's guilt or innocence. *Id.* Juror Virginia Schroder had read that a jury was going to be selected, but knew nothing factual about Fetterly or the case. (Tr. of Voir Dire at 167). Juror Hazel Davenport had heard about the case several months prior to the trial but could not remember any specifics at the time of trial. (Tr. of Voir Dire at 47). When asked whether he had learned anything about the case from the news, Juror David Knoulton said he did not know anything about it. (Tr. of Voir Dire at 48). Juror Marjorie Pulley knew some facts about the case but stated she had not formed any opinions and could be impartial. (Tr. of Voir Dire at 109–10). Finally, alternate Juror, Gloria Gonzalez, vaguely remembered hearing something about the case but could not remember the specifics. She also had not formed any opinions. (Tr. of Voir Dire at 216).

The night the jury was selected another newspaper article about the charges appeared in the local newspaper. The next day, which was the first day of trial, the trial judge asked the jury:

> Ladies and gentlemen, were any of you approached, or did anything happen during the evening recess that would change your ability to sit as a fair and impartial juror in this matter?

4. The augmented district court record now contains a transcript of the voir dire conducted in Karla Windsor's separate trial. We have examined that transcript and do not find it to contain evidence of a hostile or prejudiced community. This transcript confirms our judgment with respect to Fetterly's attempt to convince us that we should presume prejudice in this case.

5. Much of the voir dire appears in Justice Bistline's concurring opinion in *State v. Fetterly,* 109 Idaho 766, 710 P.2d 1202, 1210–22 (Idaho 1985).

No one was confronted with any information, nothing was heard or read in the news media or anything of that nature? (Trial Tr., Vol. 1 at 5). All the jurors answered these questions in the negative.

Our conclusion that Fetterly's trial was not infected by actual prejudice is supported by the fact that during jury selection, Fetterly waived his tenth peremptory challenge, indicating, as stated by the Idaho Supreme Court, that he was satisfied with the jury. More importantly, however, he did not challenge any juror for cause.

We have canvassed also the complete voir dire of the 21 prospective jurors who were not selected. In so doing, we find a convincing and reassuring lack of recollection of both the case and any of its facts, and no evidence of inflamed passions or hostility. Of the many prospective jurors questioned, only three demonstrated any possible prejudice,[6] and they were excused by stipulation. The rest showed no cause for concern, and both lawyers passed them for cause.

If the publicity we examine was as damaging as Fetterly claims, we would expect to find some substantial evidence of its effects in the voir dire. We find none.[7] Given this state of affairs, the trial court's denials of Fetterly's motions for a change of venue, a continuance, or the selection of jurors from another area were correct.

## II

### Right to Counsel

■ On August 29, 1983, twelve days before they were arrested for the murder of Sterling Grammer, Fetterly and Windsor were arrested for the entirely unrelated charge of credit card fraud. On the same day, counsel was appointed to represent them on that charge, and they were released on bond. Fetterly now argues that once counsel was appointed on the unrelated fraud charge, that law enforcement could not question him about the murder without the presence of his appointed counsel.

Fetterly is wrong. The cases he cites as support for his argument, *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), do not give him the cover he seeks. In none of those cases had the person being questioned been released from custody and then been arrested on an unrelated charge. Here, the evidence does not indicate any awareness whatsoever on the part of the arresting and questioning officers of the pending charges against Fetterly or the previous appointment of counsel. Fetterly himself did not so advise the officers, and when warned fully of his Miranda rights, he executed a signed waiver and voluntarily talked to his interrogators.

These critical circumstances render *Edwards, Jackson,* and *Roberson* inapposite. Moreover, the consequences of Fetterly's argument illustrates its folly. As the district court aptly said,

> By accepting petitioner's argument this Court would be creating chaos with this area of the law. This Court can vision a number of possible problems with the application of such a holding, like how long does the right attach for-two weeks, a month, or even two years? Does the right attach if the suspect is released on the first offense but after that commits a crime in another jurisdiction and is arrested and interrogated there? These are but two of many questions which could have absurd results if this Court were to accept petitioner's argument.

*Fetterly v. Paskett,* 744 F.Supp. 966, 970 (D.Idaho 1990).

In any event, and as he now recognizes, the Supreme Court closed the door on Fetterly's theory and request for a new rule in a case decided after he filed his opening brief in our court. In *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158

---

**6.** Prospective Jurors K. Donohue, D. Baum, and G. Blow.

**7.** We respectfully disagree with Justice Bistline of the Idaho Supreme Court regarding the effect

of the trial judge's voir dire on the jurors' answers. *See State v. Fetterly,* 710 P.2d at 1212–13 (Bistline, J., concurring specially). We do not believe that any of it was injurious or damaging to Fetterly's rights.

(1991), the Court held (1) that the Sixth Amendment right to counsel is offense specific, and (2) that the *Edwards* rule "applies only when the suspect 'ha[s] *expressed*' his wish for the particular sort of lawyerly assistance that is the subject of *Miranda.*" *McNeil,* 501 U.S. at 178, 111 S.Ct. 2204 (quoting *Edwards,* 451 U.S. at 484, 101 S.Ct. 1880) (emphasis in original). The Court said that the *Edwards* rule does not come into play without some expression by the arrestee of a desire "for the assistance of an attorney *in dealing with custodial interrogation by the police,*" and that the appointment of counsel on an unrelated charge is not enough to satisfy this requirement. *Id.* at 178–79, 111 S.Ct. 2204 (emphasis in original).

Accordingly, the district court's decision to deny Fetterly an evidentiary hearing on this issue was correct, as was its decision to reject the claim.[8]

AFFIRMED.

---

**8.** *Fetterly's remaining claims about the manner in which he was approached and questioned have no merit. We are unable to identify any conduct by the officers which was either improper or coercive prior to Fetterly's decision to talk to them.*