# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2902

_____

| | | |
|---|---|---|
| Thomas Moran, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Anne-Marie Clarke; Robert Haar; | * | |
| Wayman F. Smith, III; Jeffery Jamison; | * | Appeal from the United States |
| Clarence Harmon, comprising the | * | District Court for the Eastern |
| Board of Police Commissioners | * | District of Missouri. |
| for the City of St. Louis; Ronald | * | |
| Henderson; Paul M. Nocchiero; | * | |
| Gregory Hawkins; Al Klein; Willie | * | |
| Thirdkill, | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: October 11, 2005
Filed:  April 11, 2006

_____

Before ARNOLD, BEAM, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Thomas Moran, a St. Louis city police officer, sued various police department officials in their individual and official capacities alleging they violated his federal substantive due process rights and maliciously prosecuted him under state law. After a storied, lengthy, and racially-charged history, this case ended with the jury finding

in favor of the defendants. Moran appeals, arguing the district court[1] erred in denying his motion for a new trial because of error during voir dire. Specifically, Moran contends that his challenges for cause and peremptory challenges against all of the black members of the venire should have been granted. We disagree and affirm the district court's denial of Moran's motion for a new trial.

## I. *Background*

This case arises from the aftermath of the notorious 1997 beating of Gregory Bell, a mentally-impaired black teenager, by St. Louis police officers. The incident catalyzed racial tensions in the community. Moran's lawsuit alleged that city officials, several of whom are black, made him a scapegoat for Bell's beating because he is white. Moran contended no evidence linked him to the beating. The factual and procedural history of this case is well-documented. *Moran v. Clarke*, 296 F.3d 638 (8th Cir. 2002); *Moran v. Clarke,* 309 F.3d 516 (8th Cir. 2002); *Moran v. Clarke*, 213 F. Supp. 2d 1067 (2002), *Moran v. Clarke*, 359 F.3d 1058 (2004); *Moran v. Clarke*, 323 F. Supp. 2d 974 (2004).

In the most recent district court proceeding, the matter went to trial. During voir dire, Moran moved to strike for cause two of the four black members of the venire, Juror Norman-Cook and Juror Greene. In response to questioning, both jurors expressed strong feelings about the Bell incident. However, both Norman-Cook and Greene also indicated that they could be fair and impartial, despite the fact that doing so would be difficult. The district court denied the challenges for cause.

---

[1]The Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa, sitting by designation. *See Moran v. Clarke*, 309 F.3d 516, 518 (8th Cir. 2002) (per curiam) (holding that a district judge outside of the Eastern District of Missouri would preside over this case and appointing Judge Pratt by random drawing).

Moran then attempted to strike all four black members of the venire with peremptory challenges. In response, the defendants challenged the proposed strikes under *Batson v. Kentucky,* 476 U.S. 79 (1986). Moran's counsel proffered race-neutral explanations for the proposed strikes. First, Moran stated that Norman-Cook, an intensive care unit (ICU) nurse, said that images of Bell's beating gave her flashbacks to other seriously injured persons she has treated over the years as an ICU nurse. Moran noted that Norman-Cook had a mentally-challenged nephew. Norman-Cook stated several times that she had very strong feelings about the case, but she also stated that she could base her judgment of the case on the facts presented in court despite those feelings. Moran's peremptory challenge was granted with respect to Norman-Cook.

Second, Moran's race-neutral reasons for excluding Juror Greene were Greene's recollection of emotion and anger surrounding the Bell incident and belief that he would have trouble being impartial. Third, Moran noted Juror Tate's unemployment and that he appeared hostile and antagonistic[2] as race-neutral reasons for using a peremptory challenge. Fourth, Moran provided two race-neutral reasons for the peremptory challenge to Juror Jones: (1) Jones testified during voir dire that he had served on a federal jury recently but could not remember the judge's name or the case outcome, and (2) Jones indicated in his voir dire questionnaire that he watched TV but testified that he did not remember hearing about the widely televised Bell incident. Notwithstanding the foregoing proffered race-neutral reasons for striking Jurors Greene, Tate, and Jones, the district court concluded that the reasons proffered were pretext. The district court rejected Moran's race-neutral reasons without requiring defendants to state why the reasons proffered were pretext.

---

[2]At the end of voir dire, and on his own initiative, Tate expressed his belief that the attorneys had not been clear about what the case was about. Moran claims that this statement was hostile and that Tate was also slightly antagonistic during voir dire. Defendants dispute both claims.

Following trial on the merits, the jury found in favor of the defendants. Moran then moved for a new trial, alleging error in the denial of his for-cause challenges and peremptory challenges. In its published order denying the motion, the district court reaffirmed its disbelief that the reasons for the peremptory challenges were race neutral. The court noted that "Mr. Greene was hardly the only member of the venire panel who recalled the Bell incident, yet he was the only venire person [Moran] chose to strike because of his memory." 323 F. Supp. 2d at 981. The court further observed that striking Greene because of his memory was difficult to reconcile with the attempt to strike Jones due to his lack of memory of the Bell incident. The court also stated that there was no support for Moran's contention that Tate should be struck because of hostility or unemployment. Moran now appeals. We affirm.

## II. *Discussion*
### A. *Challenges for Cause*

Moran appeals the district court's denial of his challenges for cause against Jurors Norman-Cook and Greene. We review denial of strikes for cause under an abuse of discretion standard. *United States v. Amerson*, 938 F.2d 116, 118 (8th Cir. 1991). Appellants must clear a high hurdle to obtain reversal of a district court's decision regarding the dismissal of a juror for cause. The courts presume that a prospective juror is impartial, and a party seeking to strike a venire member for cause must show that the prospective juror is unable to lay aside his or her impressions or opinions and render a verdict based on the evidence presented in court. *United States v. Wright*, 340 F.3d 724, 733 (8th Cir. 2003). Essentially, to fail this standard, a juror must profess his inability to be impartial and resist any attempt to rehabilitate his position. *See id.*

Both Norman-Cook and Greene expressed that their recollection of the Bell beating affected them emotionally. Both acknowledged difficulty being impartial, given their strong emotions. Nonetheless, both consistently stated that they could be impartial. The district court accepted the genuineness of the jurors assurances and

denied Moran's motion to strike these two jurors for cause. Given the district court's superior position to gauge the jurors' credibility, we cannot say that the district court abused its discretion.[3]

## B. *Peremptory Challenges*

Moran also appeals the district court's denial of his attempted peremptory challenges to all four black members of the venire. Specifically, the district court allowed one black juror, Norman-Cook, to be stricken by peremptory challenge but denied the dismissal of the other three, concluding the race-neutral reasons advanced by Moran to be pretextual and therefore prohibited by *Batson,* 476 U.S. 79, and its progeny.

In *Batson*, the Supreme Court set forth a three-step analysis for peremptory challenges under the Equal Protection Clause of the Fourteenth Amendment. "First, the opponent of the peremptory challenge must establish a prima facie showing that the challenge is discriminatory." *United States v. Wolk*, 337 F.3d 997, 1007 (8th Cir. 2003). Second, "[t]he proponent of the peremptory challenge must then articulate a race-neutral explanation for the challenge." *Id*. Third, "[i]f a race-neutral explanation is offered, the challenger must show that the explanation is a pretext for

---

[3]As a related matter, the district court's failure to strike Norman-Cook for cause is moot. Norman-Cook was subsequently dismissed by the court after Moran's successful peremptory challenge. Therefore, the denial of the motion to strike her for cause is moot, especially since Moran had unused peremptory challenges remaining at the end of voir dire, i.e., it could not be said that he suffered any prejudice by having to use a peremptory challenge to strike Norman-Cook. *See United States v. Ortiz*, 315 F.3d 873, 892 (8th Cir. 2002) (holding there was no abuse of discretion by district court's refusal to strike a juror for cause because the juror ultimately did not serve on the jury and "the necessity of using a peremptory challenge does not establish actual prejudice"); *cf. Fetterly v. Paskett*, 163 F.3d 1144, 1148 (9th Cir. 1998) (holding that defendant did not suffer actual prejudice due to pretrial publicity in part because defendant did not use all of his peremptory challenges).

discrimination." *Id.* We review the denial of a peremptory challenge pursuant to *Batson* for clear error. *United States v. Elliott*, 89 F.3d 1360, 1365 (8th Cir. 1996).

Moran directed all of his challenges—both for cause and peremptory—at the four black members of the venire. Thus, the defendants established a prima facie case under *Batson*, as the attempt to strike all black members of the venire and no one else raises an inference of a discriminatory purpose. *Green v. Travis*, 414 F.3d 288, 299 (2d Cir. 2005) (holding that the prosecution's attempt to use all of its for-cause and peremptory challenges to strike black and Hispanic jurors established a prima facie case of discrimination under *Batson*); *Harris v. Kuhlmann*, 346 F.3d 330, 346–47 (2d Cir. 2003) (holding that it was "objectively unreasonable" for the state appellate court to hold that petitioner failed to make a prima facie case under *Batson* where all five prospective black jurors were eliminated by peremptory challenge). In *Batson*, the Supreme Court stated that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Batson*, 476 U.S. at 97. This case involves a pattern of using challenges to strike all prospective black jurors from the venire. By finding that this pattern established a prima facie case, we do not suggest that numbers alone create or negate a prima facie case under *Batson*. *See Luckett v. Kemma*, 203 F.3d 1052, 1054 (8th Cir. 2000) ("Although the number of African-Americans struck is relevant to determining whether a defendant has made a prima facie case, that evidence alone is insufficient to negate or create such a case."). In *Luckett*, the defendant's Batson challenged rested primarily on the fact that "the prosecutor had used most of his peremptory challenges against potential African-American jurors." *Id*. We held that numbers alone could not establish a prima facie case. Here, by contrast, Moran's attempt to strike all of the black members of the venire and no one else constituted a pattern of using challenges that gave rise to an inference of discrimination.

Moran proffered race-neutral reasons for the peremptory challenges under the second step of *Batson*. The standard that a party defending a *Batson* challenge must

meet is extremely low. *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (stating that the second step of *Batson* "does not demand an explanation that is persuasive, or even plausible"). Moran's stated concerns about Juror Norman-Cook's vivid recollections of Bell's injuries and the flashbacks to her own experiences as an ICU nurse, as well as the fact that she had a mentally challenged nephew, were race neutral. By citing concerns over Juror Greene's repeated expressions of emotion and anger over the Bell incident, Moran also provided a facially race-neutral reason for the exclusion of Greene. Also, Moran provided facially race-neutral reasons for striking Juror Tate by expressing concern over Tate's unemployment and his allegedly antagonistic behavior during voir dire. Finally, Moran provided race-neutral reasons for striking Juror Jones by expressing concern over Jones's inability to remember key facts about his recent jury service, as well as his lack of recollection of the widely publicized Bell incident despite claiming that watching television was a primary hobby.

This case turns on part three of the *Batson* analysis and presents this court with a difficult issue. In a typical case, once the party making the peremptory challenge states a race-neutral justification under the second part of *Batson*, the opposing party "may then attempt to prove the facially valid reason is mere pretext and that the real reason for the strike was discrimination." *United States v. Elliott*, 89 F.3d 1360, 1365 (8th Cir. 1996) (citing *Elem*, 514 U.S. at 767); *accora d United States v. Jones*, 245 F.3d 990, 993 (8th Cir. 2001) (citing *Williams v. Groose*, 77 F.3d 259, 261 (8th Cir. 1996)).This procedure is consistent with the key principle that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Elem*, 514 U.S. at 768.

Yet, in an exceptional case, as here, this principle comes into tension with a more fundamental judicial principle: determinations of credibility, including those surrounding voir dire, are peculiarly within the province of the district court. *See Elliott*, 89 F.3d at 1365 ("On appeal, we are mindful of the fact that evaluation of the

prosecutor's state of mind based upon demeanor and credibility lies peculiarly within a trial judge's province." (citations and quotations omitted)).

The district court departed from the script of the typical *Batson* play. The court did not turn to the challenger of the peremptory challenge to put forth evidence probative of pretext. The district court found the justifications to be pretext with respect to Jurors Greene, Tate, and Jones without hearing argument from the defendants regarding why Moran's race-neutral justifications were pretext. The question we face is whether this judicial determination of pretext in a *Batson* challenge without first demanding proof of pretext from the proponent of the challenge greater than that implicit in the evidence of the prima facie case requires reversal.

Given the extraordinary nature of this case, we cannot say that the district court's findings were clearly erroneous. Race became a factor in this case at its very inception. The plaintiff's due process claim itself arises from his belief that race influenced the city's decision-making process in the aftermath of a police incident affecting a racial minority. The racial undertones and tensions permeating this case would not have escaped the notice of the district court.[4] The preferred procedure for the district court would have been to take the third *Batson* step and provide the defendants the opportunity to show pretext. But in this exceptional case, we cannot say that a new trial is warranted, where the district court decided the *Batson* query based upon its credibility assessment of the proffered reasons, and, where no argument is made that the subsequent trial lacked fairness because of juror bias. We give the

---

[4]Indeed, the district court began its discussion by acknowledging that race "played an enormous role in this case." *Moran*, 323 F. Supp. 2d at 980. The court then quoted Judge Shaw's statement that "[t]his case starts with race, becomes embroiled with race and climaxes with race." *Id.* (quoting *Moran v. Clarke*, 213 F. Supp. 2d 1067, 1074–76 (E.D. Mo. 2002) (Judge Shaw's opinion of voluntary recusal)).

-8-

same deference to the district court's decision whether it is to reject or approve a *Batson* challenge.

We emphasize the rare nature of this case and the importance of making detailed findings on the record in support of a ruling on a peremptory challenge under *Batson. U.S. Xpress Enterprises, Inc., v. J.B. Hunt Transp., Inc.*, 320 F.3d 809, 814 (8th Cir. 2003) ("We strongly urge, however, as we have in the past, that trial judges make on-the-record rulings articulating the reasoning underlying a determination on a *Batson* objection."). The First Circuit has articulated the importance of the general procedure as follows:

> Indicating these findings on the record has several salutary effects. First, it fosters confidence in the administration of justice without racial animus. Second, it eases appellate review of a trial court's *Batson* ruling. Most importantly, it ensures that the trial court has indeed made the crucial credibility determination that is afforded such great respect on appeal.

*United States v. Perez*, 35 F.3d 632, 636 (1st Cir. 1994).

In conclusion, we affirm the district court's denial of Moran's motion for a new trial. The district court did not abuse its discretion by denying Moran's challenges for cause, and it did not commit clear error by denying three of Moran's peremptory challenges given the peculiar racial backdrop of this case.

BEAM, Circuit Judge, dissenting.

While this case has gone on far too long without a resolution, the matter nonetheless required the selection of a jury that was fair to all parties, not just the defendants. Since that did not occur, I respectfully dissent.

I am in disagreement with the court on only two issues, one of which requires reversal. I will discuss the issues in order of their importance to equitable jury selection, as I see it.

While I believe both juror number 21, Ms. Norman-Cook, and juror number 4, Mr. Greene, should have been stricken for cause, the district court more clearly committed reversible error in refusing to grant Moran's peremptory challenge of Greene. Explanation of this conclusion requires the elucidation of a few important facts and the repetition of some of the court's own observations.

Plaintiff/Appellant Moran, a Caucasian police sergeant, alleges that defendants/appellees, St. Louis City officials, the majority of whom are African-American, made him a scapegoat in their effort to diffuse the public indignation, especially within the African-American community, resulting from Mr. Bell's beating. Ante at 2.

Although, as noted in my opinion in Moran v. Clarke, 296 F.3d 638, 645 (8th Cir. 2002), the record does not clearly set forth the race of the various police officers who preceded Moran to the scene of the beating and who by their own admission struck and brutalized Bell,[5] the evidence suggests that at least some, if not all, of these early arriving officers were African-American. It is clear that the police chief who led the investigation of the incident and referred Moran for criminal prosecution was African-American. It is also clear that Moran was the only St. Louis police officer of any race recommended for criminal prosecution, a prosecution that failed.

The court correctly notes that "[t]he racial undertones and tensions permeating this case," ante at 8, were enormous. In this regard, the court quotes the first assigned

_____

[5]One such participant stated, "only Jesus can count [how many times I hit Bell]." Trial Tr., Vol. III at 147.

-10-

trial judge from his opinion of recusal who said, "[t]his case starts with race, becomes embroiled with race and climaxes with race." <u>Ante</u> at n.4. Unfortunately, this may have been an understatement.

Thus, it was within this framework that the voir dire, jury selection and trial was to be undertaken. For clarity, I set forth, in part, the record of what was said by and about juror Greene and several of the other venirepersons of both races during voir dire:

Mr. Goldstein [plaintiff's attorney]:

Juror No. 4, Mr. Greene, do you remember the incident that I started to ask about?

Juror No. 4:      Very vaguely.

Mr. Goldstein:      Do you remember that–an occasion, two officers answered the burglar alarm and that what had happened was that a melee ensued and that a young man was injured? Do you remember anything further about that case?

Juror No. 4:      Do you want me to recall what I remember?

Mr. Goldstein:      Sure, absolutely.

Juror No. 4:      I remember officers responded to a burglary in progress, and apparently there was a – from my recollection again – there was a mentally-challenged man on the roof, and apparently he lived there and the officers didn't know that, but since he was mentally impaired, he was unable to explain the situation to the officers. That's all I remember.

Mr. Goldstein:      Do you remember that Tom Moran, the Plaintiff in this matter, was indicted for criminal offenses on account of that incident?

-11-

Juror No. 4:          No, I wasn't aware of that.

Mr. Goldstein:        And you are aware that that event had media coverage?

Juror No. 4:          Yes.  That's how I heard of it.

Mr. Goldstein:        Both the written press and television coverage?

Juror No. 4:          Yes.

Mr. Goldstein:        Do you remember any of the press coverage?

Juror No. 4:          No.

Mr. Goldstein:        Is there anything about what you remember that would keep you from giving a fair trial to Tom Moran and the claims that you've already been told that he has made concerning malicious prosecution and abuse of process?

Juror No. 4:          Absolutely not.

Mr. Goldstein:        Thank you.

Voir Dire Tr., Vol. I at 72-74.

Mr. Dunne [Defendants' Attorney]:

Anybody else?  Could you raise your hands again, those of you who recall the incident?

Would anybody answer that question differently than Miss Lynch answered it? In other words, is there anything about what you recall about the incident that I've just described that coming into court his morning, you don't believe it's possible for you to listen to the evidence that you're going to hear in this case and base a verdict on the claims being brought by Mr. Moran against the Defendants in this case on the evidence that you hear here and give each side

-12-

to this case a fair and impartial trial which is what your obligation as jurors is and what we're entitled to receive from you, frankly? Is there anybody who would have a hard time doing that, questions whether they can do that, or are simply prepared to tell me that you can't do that?

Is there anybody who feels that way? Mr. Greene?

Juror No. 4 [Mr. Greene]:

Just being honest. Now that we're talking about the case more, –

Mr. Dunne:      Right.

Juror No. 4:      – I'm remembering the images that were shown on TV and how badly this young man was beaten. And going on that information and what I'm remembering, it would be hard because those images stick with you.

Mr. Dunne:      It was a vivid and painful incident at the time.

Juror No. 4:      Exactly.

Mr. Dunne:      Mr. Bell's an African-American person. Do you recall that?

Juror No. 4:      Yes.

Mr. Dunne:      All right. You know, you say, "I'm just being honest." Well, to be perfectly frank with all of you, we're entitled to that from everyone. Okay? It's like somebody saying, "Well, I could be sort of fair." There's no such thing as being sort of fair. We need jurors who can be fair, be completely fair, fair to Mr. Moran. That's what he's entitled to. Fair to the Defendants; that's what we're entitled to.

      Is there anybody that feels the same way as Mr. Greene that what they recall about the incident is painful for them and

that regardless of what the evidence in this case were, they couldn't give a fair and impartial trial to both sides?

The Court:       Mr. Dunne, I think Miss Norman-Cook has her hand raised.

Id. at 93-94.

Mr. Dunne:       We've heard from some of you who have told me that it would be difficult for you to [be impartial], that this just isn't the case for you, so to speak.

Is there anybody else who has not expressed those thoughts who feels them?

(Silence)

Thank you.

Mr. Greene, I want to be very clear about something with you, sir. I don't mean to pick on you by talking to you again. Are you telling me that based on your recollection of the case, that you could not set your feelings aside, your memories aside, and listen to the evidence in this case and return a verdict based on the evidence you hear?

Juror No. 4:     I'm not saying it would be impossible. I'm just saying it would be difficult because that did stir a lot of emotions in me which I'm sure it did in a lot of people because, like I say, you just can't erase that. And I'm sure that information is going to be brought up, and it's going to rekindle some memories. Like I said, it's not impossible but it would be difficult.

Mr. Dunne:       And I don't want to assume anything is true, but let's face it. This was something that made you angry at the time it happened. Am I right about that?

-14-

| | |
|---|---|
| Juror No. 4: | Oh, by all means. |
| Mr. Dunne: | I mean it's possible to stir emotions of pleasure or happiness, but that's not what we're talking about here. This is something that made you angry. |
| Juror No. 4: | Oh, definitely. |
| Mr. Dunne: | And although you're saying it could be difficult, could you? |
| Juror No. 4: | Yes. |
| Mr. Dunne: | And, if chosen, would you? |
| Juror No. 4: | Yes. |

Id. at 99-100.

Mr. Dunne was, of course, one of the defendants' attorneys and his job was, in part, to attempt to rehabilitate any venireperson his client might wish to have on the jury. And, as I will later demonstrate, it is apparent that the defendants wanted Mr. Greene and all other African-American venirepersons on the jury, while Moran, to the contrary, wanted all Caucasian venirepersons as jurors, if possible.

At completion of voir dire, Mr. Karsh, one of Moran's lawyers, moved to strike for cause several venirepersons, including Greene. Karsh explained specifically that "Juror No. 4, Mr. Greene, and Juror No. 21, Miss Norman-Cook [also an African-American venireperson][6] both testified to their extreme difficulty in remaining fair during this trial on the basis of the images they have of a beaten Gregory Bell. They

_____

[6]Ms. Norman-Cook had testified that she remembered the Bell incident and that it would be difficult to sit as a juror in the case. She also stated that she worked in an intensive care unit and that she had a retarded nephew. Voir Dire Tr., Vol. 1 at 96-98.

-15-

both indicated that they were angry, and setting aside their anger would clearly be an enormous problem." Id. at 113. The motions to strike for cause were overruled.

Karsh then sought to peremptorily challenge jurors numbered 4 (Mr. Greene), 8, 17 (Mr. Tate)[7] and 21 (Ms. Norman-Cook), all of the African-American venirepersons. At this point, Dunne interposed a Batson objection to the proposed strikes on behalf of the defendants. Id. at 119. Karsh then advanced (as step two of the Batson procedure requires) legitimate nondiscriminatory reasons for seeking to strike the potential jurors. He again specifically pointed out that "Mr. Greene testified that his recollections on the Gregory Bell incident made him angry and he [Greene] was very hesitant about being able to put aside his emotions and render a fair and impartial verdict." Id. at 120. At the conclusion of this discussion, the court, without requiring or permitting anything more from any party, granted the Norman-Cook peremptory challenge and said, "[t]he other three are overruled. I think those are not legitimate nondiscriminatory reasons. They're staying." Id. at 121. When Karsh attempted to "re-emphasize" Greene's anger, the court stopped him, stating, "I made my ruling, counsel. You made your record." Id. Moran's lawyers attempted no further strikes and the three challenged African-Americans remained in the venire to be considered by assigned number when the jury was finally seated. Being a low number, juror number 4, Mr. Greene, became a member of the jury after remaining unchallenged by the defendants.[8]

---

[7]During his response to the Batson objection, Karsh, for his nondiscriminatory showing in support of the peremptory challenge, pointed out that Mr. Tate was unemployed and had expressed some antagonism toward counsel for the parties which was "somewhat offputting." Voir Dire Tr., Vol. I at 120-21.

[8]The Clerk of Court presented venirepersons numbered one through forty to the district judge for jury selection. All forty venire members were questioned at voir dire. After challenges, both cause and peremptory, were sustained or overruled, the lowest-numbered twelve venirepersons remaining were seated to hear the case. Jurors 1, 2, 3, 4, 6, 8, 9, 12, 13, 15, 17 and 18 were selected.

-16-

The defendants then peremptorily challenged jurors 10, 11, 14 and 16, all Caucasian venirepersons, and all potential jurors with lower juror numbers than Mr. Tate, juror number 17, one of the African-American venirepersons sought to be challenged by Moran.[9] Thus, these peremptory challenges, when sustained by the court, insured that Tate would be seated as a juror. When Karsh, in turn, objected that the defendants' strikes were all Caucasians, and noted that nothing was developed at voir dire to support the strikes, Dunne, on behalf of the defendants, stated "Your Honor, it's in the nature of peremptory challenges that they may be offered for any or no reason." Id. at 124. Adding, upon interjection by the court the notion of race, age and gender discrimination, "[u]nless–I was about to add, your Honor, the proposed venire person being challenged is a member of a protected class [apparently referring only to the African-Americans] whose right to serve ought to be protected by the Court." Id. When the court noted to Karsh that "all that's left [for the defendants] is Caucasians," id. at 123, Karsh corrected the court by noting that jurors 4, 8 and 17, the African-American venirepersons he had attempted to strike, remained available.

Of course, when reminded by Karsh that Edmonson v. Leesville Concrete Co., 500 U.S. 614 (1991), can be read to extend Batson-type protections to all races, at least in criminal cases, the district court, while agreeing with Dunne that no nondiscriminatory reasons were actually needed for his peremptory challenges of the Caucasian venirepersons, id. at 124-25, required Dunne, apparently out of an abundance of caution, to respond to Karsh's objections as to jurors 10, 11, 14 and 16. See, e.g., United States v. Allen-Brown, 243 F.3d 1293, 1295 (11th Cir. 2001) ("[B]y its terms Batson is not limited to members of racial minorities."); Gov't of Virgin Is. v. Forte, 865 F.2d 59, 64 (3d Cir. 1989) ("[W]e will not read Batson to make a distinction between white and black defendants.").

---

[9]See ante at n.4.

According to the record, the reasons advanced by Dunne and the district court's response to the showing were as follows:

Mr. Dunne:     Your Honor, Juror No. 10 is employed as a professor. He had 32 years as a teacher and principal in the secondary Mehlville School District and then works as a college professor now. He also teaches a class in Business Law. It's my belief that such a person tends to have stronger opinions which I prefer not among juries that I select in the school teaching profession.

Juror No. 11 apparently frequents a tavern near the place where I also live. He objected to karaoke, which I happen to enjoy, and so I didn't like his points of view where those matters were concerned. I also thought that Juror No. 11 had a somewhat, although refreshingly flippant but a somewhat of a flippant sense of humor.

Juror No. 14, Miss Giessing, said that she tended to be or was in the past politically active and also made a comment and – something about what she considered to be trivial lawsuits going to trial. I didn't like those comments. I realized after voir dire concluded that I know Gail Hadican's [juror number 16] husband. He's an attorney here in town, and I didn't want to be in a position of having Mrs. Hadican serve on a jury that I was trying a case in front of.

The Court:     Okay. I think those are all legitimate nondiscriminatory reasons.

Voir Dire Tr., Vol. I at 125-126.

The Caucasian venirepersons were summarily stricken without permitting Karsh to attempt to make a showing of discriminatory animus on the part of Dunne in his making of the challenges of the lower-numbered Caucasian venirepersons.

-18-

Thus, it is clear from the record that both sides wanted to use peremptory challenges to racially shape the jury. Only the defendants were allowed to successfully do this in any discernible measure.

Although not material to my dissent, I digress to note that this may have been one of those rare cases in which the intended remedial thrust of Batson does not fully contemplate the deeper issues in a case so permeated with race. That being said, perhaps both parties should have been permitted to use more liberalized bases for "cause" challenges accompanied by the elimination of "peremptory" challenges altogether. See Hon. Theodore McMillian & Christopher J. Petrini, Batson v. Kentucky: A Promise Unfulfilled, 58 UMKC L. Rev. 361, 374 (1989-90); State v. Cromedy, 727 A.2d 457, 467 (N.J. 1999) ("[I]n a prosecution 'in which race by definition is a patent factor [, race] must be taken into account to assure a fair trial.'") (alteration in original) (quoting State v. Harris, 716 A.2d 458 (N.J. 1998) (Handler, J., dissenting)); Grutter v. Bollinger, 539 U.S. 306 (2003) (permitting use of minority racial preferences in law school selection process that rejected a white female applicant whose purely academic qualifications exceeded those of a student who was admitted based in part on diversity).

Assuming, as I must, that Batson fits this case, I turn directly to the district court's major error. Dunne was, of course, correct in stating that, absent race, age and gender considerations, a peremptory challenge may be asserted "for any or no reason." Voir Dire Tr., Vol. 1 at 124. He was also correct in lodging a Batson objection for his clients when all African-Americans were challenged. The district court, however, erred by not applying Batson even-handedly to both parties' peremptory challenges, as precedent requires. And, contrary to the court's analysis, our review is not limited to clear error. We must review not only the trial judge's conclusions about the reasons given for the strikes, but we must first consider de novo whether the judge correctly applied the law established by Batson and subsequent cases.

-19-

I agree with the court that there is precedent for the proposition that the challenging of all African-American venirepersons by a Caucasian plaintiff is sufficient evidence of racial motivation to establish a prima facie case of race discrimination. But, a prima facie case is not sufficient, standing alone, to establish purposeful racial discrimination if nondiscriminatory, nonpretextual reasons for the challenges are advanced by the plaintiff. At the same time, the defendants' proposed (and ultimately successful) challenges of the four lower-numbered Caucasian venirepersons were also sufficient to establish a prima facie case of race discrimination. This is so because it was obvious that the result intended was to maximize the number of African-Americans seated on the jury. Thus, contrary to the trial court's initial inclinations, the defendants likewise had a duty to advance nondiscriminatory, nonpretextual reasons for the proposed strikes.

More importantly, however, after examination of Karsh's reasons for the proposed peremptory strikes, the district court obviously recognized that the articulation concerning Ms. Norman-Cook was sufficient. The Norman-Cook showing was based upon her own testimony concerning the Bell incident. The challenge was properly sustained. Mr. Greene presented almost exactly the same set of circumstances except that he did not work at an ICU or have a relative with a disability. There was absolutely nothing incredible about Karsh's recitation of Greene's testimony. It was straight from the evidence before the court. The Karsh presentation clearly answered, under step two of the Batson procedure, the defendants' prima facie theory. Accordingly, any presumption of discrimination based upon a prima facie showing totally disappeared from the case. While the substance of the explanations advanced by Karsh was properly evaluated by the trial court for discriminatory animus, even after the prima facie case was gone, no such animus emerged from the reasons stated by Karsh. Under any reasonable credibility evaluation, the justifications advanced by Karsh as to Mr. Greene were clearly nonpretextual. For instance, no other unchallenged venirepersons of any race who remembered the Bell incident expressed problems with giving Moran a fair trial.

Indeed, the evidence tended to run in another direction, that is, toward a possibility that Greene would have trouble giving Moran a fair trial. In fact, the recitation of Greene's own testimony about his concerns over his ability to be fair to Moran because of his anger over Bell's beating tended to negate, not establish, an invidious racial reason for the Greene challenge. And, though the defendants were not required to do so, they did not offer any information to the contrary. To be sure, Greene was weakly rehabilitated by Dunne, the defendants' counsel but, to be fair, only barely so. As the Ninth Circuit has pointed out, rehabilitation is only sparse evidence of ability to fairly serve. "In determining whether a district court has abused its discretion in refusing to remove a juror for actual bias, this court accords significant weight to a juror's definitive statement that he can serve impartially. Nevertheless, 'the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights.'" United States v. Gonzalez, 214 F.3d 1109, 1112 n.3 (9th Cir. 2000) (quoting Murphy v. Florida, 421 U.S. 794, 800 (1975)) (citation omitted). In the same vein, I disagree when the court says that during voir dire "both [Norman-Cook and Greene] consistently stated they could be impartial." Ante at 4. They were, at best, equivocal on the issue. Neither do I agree that the Batson inquiry permits a trial judge's credibility determinations to trump the due process dimensions inherent in seating a fair jury. I could find no precedent supporting such a balancing act and, if it can occur, constitutional rights must surely prevail.

In any event, the trial judge overruled Karsh's strike of Greene not because the defendants proved "purposeful racial discrimination" as the law requires, Purkett v. Elem, 514 U.S. 765, 767 (1995) or because the *defendants* showed that Moran's *reasons* were pretext for discrimination, United States v. Wolk, 337 F.3d 997, 1007 (8th Cir. 2003). Rather, the trial court improperly stopped at step two of the Batson process (see ante at 7 concerning the three steps of the Batson analysis), collapsing step three into step two, something the Supreme Court has said may not be done. In Elem v. Purkett, 25 F.3d 679 (8th Cir. 1994), this court said,

-21-

[W]here the prosecution strikes a prospective juror who is a member of the defendant's racial group, solely on the basis of factors which are facially irrelevant to the question of whether that person is qualified to serve as a juror in the particular case, the prosecution must at least articulate some plausible race-neutral reason for believing those factors will somehow affect the person's ability to perform his or her duties as a juror.

25 F.3d at 683. Not so, said the Supreme Court. "If a race-neutral explanation is tendered [at step two], the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." Purkett, 514 U.S. at 767. The Court explained that at the second step, the reason given does not have to be persuasive or even plausible. "'[T]he issue is the facial validity of the prosecutor's explanation. *Unless a discriminatory intent is <u>inherent</u> in the prosecutor's explanation, the reason offered <u>will be deemed</u> race neutral*.'" Id. at 768 (emphasis added) (quoting Hernandez v. New York, 500 U.S. 352, 360 (1991)).

In this case, the articulation by plaintiff's attorney was on its face race-neutral, relevant, accurate and nonpretextual. The reasons given were certainly not inherently discriminatory. Rather, the reasons abundantly established that Mr. Greene was a very problematic juror, who would very possibly not be fair to Moran given Greene's admitted state of mind over the Bell incident.

Karsh's peremptory challenge of Mr. Greene should have been sustained. It was error not to do so.

Were I able to apply a "harmless" error review to the district court's error, I would still be inclined to reverse because, as the court stated, "the racial undertones and tensions permeating this case" were enormous. Ante at 8. On the other hand, I likewise agree with the court that the "storied, lengthy" history of the case suggests an ending of some kind would be in order. Ante at 1. But, courts consistently find

that the existence of even one juror who should have been either seated or excluded is a structural defect requiring automatic reversal.  Becht v. United States, 403 F.3d 541, 547 (8th Cir. 2005) (citing Neder v. United States, 527 U.S. 1, 8 (1999); Ford v. Norris, 67 F.3d 162, 170 (8th Cir. 1995) (holding that peremptory exclusion of eligible juror violates Swain v. Alabama, 380 U.S. 202 (1965) and is structural defect); United States v. McFerron, 163 F.3d 952, 956 (6th Cir. 1998) (stating that erroneous combination of second and third steps of Batson which resulted in denial of valid peremptory challenge resulted in structural error and new trial); and United States v. Annigoni, 96 F.3d 1132, 1143 (9th Cir. 1996) (en banc) ("'The denial or impairment of the right [of peremptory challenge] is reversible error without a showing of prejudice.'" (alteration in original)) (quoting Swain, 380 U.S. at 218).  The Annigoni court stated:

> every other circuit to address this issue agrees that the erroneous deprivation of a [party's] right of peremptory challenge requires automatic reversal.  See United States v. Broussard, 987 F.2d 215, 221 (5th Cir. 1993) ("The denial or impairment of the right to exercise peremptory challenges is reversible error without a showing of prejudice."), abrogated on other grounds by J.E.B. v. Alabama, 511 U.S. 127 (1994); Olympia Hotels Corp. v. Johnson Wax Dev. Corp., 908 F.2d 1363, 1369 (7th Cir. 1990) ("It is reversible error to deny a party to a jury trial the peremptory challenges to which the rules of procedure entitle him . . . ."); United States v. Ruuska, 883 F.2d 262, 268 (3d Cir. 1989) (affirming the automatic reversal rule described in Swain, and stating that Batson "does not call into question this aspect of Swain."); United States v. Ricks, 802 F.2d 731, 734 (4th Cir.) (en banc), cert. denied, 479 U.S. 1009 (1986) (same); Carr v. Watts, 597 F.2d 830, 832 (2d Cir. 1979) (impairment of right of peremptory challenge is "reversible error without a showing of prejudice").  Other circuits have recognized the automatic reversal rule in dicta.  See United States v. Cambara, 902 F.2d 144, 147 (1st Cir. 1990) ("restricting a defendant's use of the lawful number of peremptory challenges is reversible error if a challenge for cause is erroneously denied") [abrogated on other grounds by United States v. Martinez-Salazar, 528 U.S. 304 (2000)];

> United States v. Mosely, 810 F.2d 93, 96 (6th Cir.), cert. denied, 484 U.S. 841 (1987) (same).

96 F.3d at 1141 (some citations omitted).

Here, we had a venireperson seated, Mr. Greene, who should have been excluded. Precedent rightly demands that invidious racial reasons should never be used to exclude an otherwise qualified juror. But, on the other hand, precedent does not support the seating of a properly challenged juror simply because of his minority racial status. Justice Thurgood Marshall in his eloquent Batson concurrence stated "Our criminal justice system 'requires not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held.'" Batson v. Kentucky, 476 U.S. 79, 107 (1986) (quoting Hayes v. Missouri, 120 U.S. 68, 70 (1887)). The same principle holds true in a civil case such as this.

In my view, the scales were not so evenly held in the jury selection in this case. Accordingly, I dissent.

_____